The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. All right, Counsel for the Appellant, would you like to proceed? Yes, Your Honor. May it please the Court? Your Honors, it does not escape us that, Your Honors, first off, I've been an active member of this Court for over 10 years now, and I am well aware that the Court is not required to order oral arguments, so I thank the Court for providing this argument in this case. Your Honors, I have racked my brain for quite some time trying to figure out how to encapsulate this case and to provide the Court with nuggets that would be helpful to address the issues in the case that maybe were not highlighted on paper. And, Your Honors, what I think is most important for the Court to know, and the best place to start, I believe, is that the City in this case rendered a series of decisions concerning Mr. Thomas' employment based purely on an independent medical evaluation of a physician who examined him one time. Your Honor, the disability, Your Honors, the disability retirement decision, the order for Mr. Thomas to return to full duty, his placement on leave without pay, and his termination were all based on the IME of Dr. Friedler. So Dr. Friedler is central to this case. Now, Mr. Thomas was actually required to undergo more than one independent medical evaluation, but the actual decisions were based not on the Dr. Rosenthal IME or the Matthews IME, but for the City's own reasons, it decided to use just this one IME and completely disregard Dr. Friedler's IME and completely disregard Mr. Thomas' evaluations and treatment from his surgeon and physician, Dr. Fechter. Now, the... Was Dr. Friedler used in other cases? I'm wondering if, and the use of the IME, the independent medical exam, wasn't that used by the City in evaluating whether police officers could be medically cleared to return to full duty? Right. So, Your Honor, it does appear that the City has used evaluations, independent medical evaluations for other, to clear other officers. However, it's not clear at all that the IME would be the sole basis or that the physician's decision, or that would override the decisions of a, of a treating physician. Now... Mr. McCormick, this is Judge Diaz. Can you hear me? Yes. Yes, Your Honor. Okay. So, can I, let me ask this. You've made these points about this, what you think to be a sort of unusual, perhaps aberrational process. And the question I have is, I assume these arguments that you made were made in the parallel state court proceedings where the actual merits of the disability determination were resolved. Am I right? Your Honor, I didn't represent Mr. Thomas at the disability, well, so Mr. Thomas appeared before the Disability Retirement Board, which is an administrative hearing, but I did not represent him there. So, do you, but do you know whether or not these arguments that you're making now were, I assume a competent lawyer would have raised some, if not all of these, and it would appear that the decision was affirmed. So, the question before us is not the sort of the merits of that decision, but whether there was something else afoot here that amounted to discrimination or some violation of Title VII or some other disability or some other discriminatory motive or cause of action. So, what's, what's the evidence of that? Okay. So, Your Honor, I think it's important to understand the difference between, the nuances between the administrative boards and the federal laws. As Your Honor has already highlighted, the question here is whether the city rendered these decisions for a discriminatory basis. And at the, at the administrative stage, we know that the main question is whether there was substantial evidence for the decision. So, that substantial evidence, at least my understanding of it at the administrative board level, was the IME itself. Here, Your Honor. I want to keep coming back to the point, isn't that, was the IME a standard departmental procedure? Right. So, so Your Honor, and that's a great question, Your Honor. So, the, an IME for a disability, for a disability retirement was, it doesn't appear that it, that it was standard. We received, we, in, in at least some cases, it appears that the physician, the physician's notes were the primary basis for determining the disability retirement. And that, that's, that was the, the administrative hearing that Judge Diaz referenced earlier. But with, with respect to whether or not an individual will return to full duty, there's a policy, there are policies in place that require a physician's certificate to return to full duty, Your Honor. So, there, so in, in addition to questioning whether or not it was discriminatory, we know for a fact that, that the chief and the department violated the policies. In fact, Chief Pristoup admits that he violated policies when he returned Mr. Thomas back to full duty without a physician's certificate. But what does that have to do with discrimination, which is what this case is about, and retaliation? Right. So, so the, the question of discrimination or retaliation, well, it's, we have to look, we don't have any direct evidence of discrimination, first of all. So, we are required and, and we, we're required to use the McDonnell-Douglas test to determine whether or not there's discrimination. So, we believe that Mr. Thomas, the, the only issues within the McDonnell-Douglas test, there's, there's no issues to whether or not he was a member of a protected class. There's, there's no real issues to whether or not he was, there was an adverse decision. The, the issue. Okay. Excuse me, Mr. McCormick, this is Judge Keenan. Yes. Could you tell us what the adverse employment actions were in this case? Okay. How many were there? So, the, the adverse employment actions would be, one, obviously the termination, that would be, be a significant adverse employment action. Two, Mr. Thomas was placed on leave without pay. That is an adverse employment action. Three, we believe, and, and this hasn't really been an issue that I think the court has addressed, but we do believe that the disability retirement denial was an adverse employment action. And that's one of the reasons why, why I started there. And the return to full duty was a, was an adverse action. So, so you're honest. The, the, the adverse actions in this case are numerous. The issues that, that the parties have disputed really have been, one, whether there was satisfactory performance. And two, whether there were any individuals who were similarly situated to Mr. Thomas. And we know that Mr. Thomas did perform to the satisfaction. Counselor, you indicated in somewhere, I think, in your brief that yours was a case of first impression. And the question that popped into my mind was, if it's a case of first impression, is there any comparator? For example, somebody who was medically cleared to return to duty and, and was not, because the, or might follow the ice of the treating physician and allow the treating physician to overcome. The end of the AMA. Yes. And I gather there was no such him. Oh such individual. No, but led me to think that there may be no comparator. But there was your honor and we cited to the individual. I don't know if we're public and I can mention the name, or are you talking about. Excuse me, are you talking about Nicole keys as being a comparator. Yes, your honor, she's the, she, she would be one of the comparators, but, but the, the most important comparator that we use for Mr. Thomas. She, the decision regarding her disability retirement was made by the exact same human resources personnel director. I thought in the case of Ms. Keys at her IME indicated she was not fit for work as a police officer, whereas yours indicated that you were medically clear to return. Your honor, I'm not, I'm not sure about Ms. Keys is IME or whether you, whether she even had an IME, but what's important in this case is that Ms. Keys disability retirement was based on her physicians recommendation her super position certificate. Rather than an IME. And also your honor, you know, but that's a difference for purposes of disability when someone. If one person was seen to be medically clear to return to duty and someone else is ruled under the IMA that she was not fit medically to return to work as a police officer. Right, your honor, but there are two different issues. There's the, there's the, the return to duty right return to full duty from, from light duty. And then there's a disability retirement with respect to both those issues. One, the, with respect to disability retirement, Ms. Keys physician in, in the, in the approval for disability retirement. Mr. Rinstead specifically states that based on the physician certificate and other, and other things, but it doesn't say based on an IME that she's been approved for disability retirement. Mr. Thomas, on the other hand, based on one thing. If this, you say this department was discriminating against you, but in looking through the record, it indicated that they had been over backwards. If you extensive periods of leave and extensive periods of light, light duty, even to the point where they were minus an officer first class on the street for over two years. But they, they were so if they harbor this discriminatory animals, how do you explain the fact that they gave you all of this leave and light duty, even though they were left, even though it was left. They were left shorthanded on this street for a prolonged period of time. Don't understand that. And the other thing I don't understand is even though I have been an unpaid. At us. I would think the department wanted to know since she was still technically a member of the force. I'm exactly what you're at us was or whether you felt you could return a client could return to duty. And it seems to me that there's a lengthy record here of a refusal to communicate or to risk or to answer your phone or to return voice messages. And even to respond to personal inquiries when there was an in person con contact and wouldn't the department within its rights to want to develop some kind of plan about your status and your desire to return to work. If it's shorthanded by an officer on the street. And they, you know, I guess what troubled me about the case was that they had Given you all of these extended leave periods and they've given you this light duty and you wouldn't even talk to them you you wouldn't return any calls and and Or communicate or give them a status report or tell them. Well, I think I can come back. I'm doing this. I'm doing that to try to get ready to come back. I mean, Done a significant part of the problem here lie with your Your lack of cooperation. Thank you, Ronnie. May I answer the question. Yes. Okay, well, there are two issues. And the first was was the lead that was granted to Mr. Thomas and and and first off, your honor. Mr. Thomas was granted a deal of leave, but he wasn't granted any more leave than any of the other officers on the force who suffered injuries. So in granting him that leave and they granted it from on or around October of 2014 to about June of When Mr. Thomas requested a disability retirement. Once he requested that disability retirement. This is when the discrimination really started against him. So as far as that that right to The right for to for the department to request Mr. Thomas to return from leave or to at least communicate communicate with them. Yes. And in ordinary circumstances, that would be fair. And I'm, and I'm not by any means saying that this is a perfect case, however. In after Mr. Thomas requested a disability retirement and was denied. He's still injured. He's forced to return back to full duty, then he's injured again after that. He's required to either take a demotion or to go on leave without pay. So he's on leave without pay at this point. So when so when the department is saying that Excuse me, though, Mr. McCormick. This is Judge Kenan. I guess I'm piggybacking on Judge Wilkinson there because I'm concerned whether he was satisfactorily Fulfilling his duties as an employee by not answering. Are you saying that when you're on leave without pay, you can simply ignore your employers attempts to contact you No, your honor. And that's a that's a that that's a good question. And this is, this is, like I said, this is, you know, part of the more. This is one of the more prickly issues in the case, should he have returned Return the calls. Well, on the one hand, I think that one can say, well, yeah, of course you have to return your employers calls, but I think in this particular case, we have to look at the reason. So he's he's not just on leave without pay. He's challenging a disability retirement at this time. His, his attorney has specifically requested that any any communications go directly through him. I would think that Mr. Thomas would be concerned because we're talking Mr. Thomas is on leave without pay from on or around July 2015 all the way until he's terminated. I believe in April of 2016 so during this entire time he's he's not receiving paid. There really is no reason for the department to contact him. But more importantly, I think that he would be incredibly concerned about receiving a call and what does he do Is he offended, you know, would he would he be going against his attorney's wishes if he's answering the call. So I can I can certainly under understand that. But in any event, whether whether it's it's that he was he was he may have been incorrect and not answering the calls or not. In this we we must Recognize the scope in which this case is and that that is summary judgment and all facts and inferences must be All facts and inferences must be drawn in favor of the plaintiff. Mr. Thomas, in this case, so could he have have had a legitimate reason for For not answering the calls. I think so. But more importantly, this satisfactory performance as stated by Mr. Rensted Is based on your performance appraisal and if and if it isn't on a performance appraisal, there would have had to have been some sort of communication. For Mr. Thomas. Now it's important here that the police department has insisted that this is not a That this is not a disciplinary matter because if it is a disciplinary matter, then they would have had been required to he would have been entitled to his leo VR rights, which he was not so It's even if even if they had a right to take some action against him. To me, it seems like it would have been disciplinary action. I don't think that we should have taken disciplinary action against them, considering the fact Excuse me, considering the fact that he was on leave without pay. And that he, you know, he had been communicating through his attorney through his doctor that he's on leave without pay and that he's not healing. What about the department's offer to him to reassign him to a record specialist position. Yes, Your Honor. So he had the right to accept that records specialist position or to refuse it. But again, in this case, we have to look at where we were when the position is offered. So he had been denied a disability retirement, but he's challenging that decision. Had he accepted the the the records specialist position at that time, it could have affected his his standing in the police department, he could have potentially have waived his rights. To continue to pursue his appeal of his disability retirement and he would have been at a lower grade and salary, then he would have been as a police officer, so He had legitimate reasons for for refusing the record specialist position at the time that it that it was offered. Mr McCormick, Judge Keenan, again, I'm concerned where your factual basis is for racial discrimination. What is the factual basis that would indicate that he was treated differently because of his race. Well, Your Honor, again, you know, we're there isn't any there were there were no comments that were made. There were no statements that that were made, but there were many actions from the police department that suggest That But for his race, he would have been treated very differently. Every other every other officer. Every other police officer and we're required to use a comparative and we did, but every other police officer was treated very differently than Mr. Which can which comparators. Are you talking about now in terms of race discrimination. Again, we again, Your Honor, we go back to to Nicole keys. I think it's because All of the she had an, but she had an IME you said she you didn't know if she had an IME. But yes, she did. Dr. David Maine. Conducted her IME and recommended or explicitly said that she could not perform the physical duties of a police officer. So she was granted disability retirement based on Dr. Maine's medical opinion, which But Your Honor, the, the, the disability retirement decision, the personnel officer who rendered that decision specifically stated that Nicole keys decision was based on her physician that it was not. It wasn't based on an on an IME. And, and, and, and your honors, you know, the fourth circuit has never to my knowledge, this issue. I think it, I think there was a, there was one case in a footnote regarding the treating physicians doctrine. This court hasn't, hasn't recognized it, but it would potentially be dispositive. Our sister circuits have the second circuit, the third circuit, they recognize that a treating physician who has seen an individual And, and, and treated an individual that their opinion should be considered. It should be given more weight than one of an IME. Individual wants, but whether it's an informant, can I just follow up on this issue? Granted that the letter says what it says that your opponent on the other side makes two points about that letter. She says, first, that the letter wasn't drafted by the decision maker, Mr. Rennstedt, but by another employee with HR. But then she points to the fact that Mr. Rennstedt, in fact, testified that when it came to the disability retirement of Ms. Keys, it was granted because there was an IME that said that she couldn't work as a police officer. I mean, isn't that pretty much dispositive of the claim? No, it's a dispute effect. It's a dispute effect. They're creating, they're creating their own dispute. So now, so you have, you have a document that has been authenticated that says this is what the decision is based on. And Mr. Rennstedt is saying something completely different. It's a dispute effect. Well, I mean, the letter doesn't, I don't imagine purports to be exclusive, does it? I mean, I guess I suppose you're reading it that way, but I'm not sure that that's a reasonable reading of the letter. Well, I think that you have to infer all facts and inferences in our favor, Your Honor. And if that, if, if, if the, if the letter does not, if the letter does not mean what it says, then maybe yes, there could be other reasons. But if it means what it says, which is, I think the only reasonable interpretation of that letter. And again, Your Honor, we're limited to this. We're limited to Nicole Keyes, right? She's, she's our comparator. But all of these other, all of these other decisions, they, they simply did not use an IME that was specifically, again, let's talk about, about the IME from, from Dr. Friedland. The IME was specifically intended to be used for workers' compensation. Now, there's a dispute. Mr. Renstedt says, no, we didn't, the IME was not for workers' compensation purposes. However, that IME never, the, the IME from, from Dr. Friedland never makes mention of, of a disability retirement, whether or not he should be granted a disability retirement. The IME was, I think, drafted maybe five days before or five days before, or I'm sorry, five days after the, the request for disability retirement. So, and the IME was drafted to an attorney for the third party administrator for the city. So the, the IME, it, it, it, it, it, it, it, it, they decided to use it for a purpose for which it was never intended. We know, and we should know, I mean, let's face it, an IME doctor is going to say what you want them to say, that their doctor is specifically Dr. Friedland, 70% of his practice. No, no, no. 100% of his practice was dedicated to performing IMEs. 70% of those were for employers. So if he, if you ask him about a workers' compensation claim, yeah, does it, and you, and you're challenging the workers' compensation claim, which the city was in this particular case, yes, there's going to be a very good chance that Dr. Friedland is going to say that is going to agree with you. And in his opinion, Mr. Thomas could go back to work, of course. But in Dr. Matthews' opinion, a third IME from, a third IME that the city had for Mr. Thomas, for whatever reason, he said that Mr. Thomas could not go back to work for- Well, I'm still concerned with your using Nicole Keyes as a comparator, because here, part of the city's case is that Officer Thomas was not satisfactorily performing his job because he was out of touch for six months. And there's no evidence whatsoever that Ms. Keyes engaged in the same conduct and was treated differently, was given a pass, essentially, for failing to communicate. So how can we compare them? Your Honor, I think that we can, if you were to believe that the main reason, let's say we isolate, let's isolate the issues, right? So if we just focus on this issue of refusing to maintain contact, and we believe that that's an issue. Well, then, and we consider that performance, then we must look to the policies of the department and the city with respect to performance. And I asked Mr. Renstedt, how do you determine performance? Well, performance is determined by your annual performance appraisals. It's determined by your, which are written. And if there is a performance issue, which derives after a performance appraisal, then you have to be given notice and an opportunity to cure. So there was no written notice. Yeah, they may have said, you have to, you should maintain contact. They didn't say how often you have to maintain contact or whether or not, if you miss a call, or if you refuse to call that you're going to be terminated. There was never anything like that. Well, they kept sending email. Why doesn't that serve as unanswered email, kept asking him to get in touch? Why wouldn't that serve as notice? Your Honor, yeah. So when we talk about unanswered emails within an extended period of time, again, there's no provision, even in those emails, that if he failed, that there's going to be some sort of disciplinary action for him not responding. However, Your Honor, I think it's important, and I keep saying it, well, I've said it once, I think, but I think it's really important that Mr. Thomas's attorney was also involved in this at this time. So we have to be, we have to consider the time. I don't think that we can distinctly, I think it's important that we consider the timeframe, right? So during- Mr. McCormick? Yes. Mr. McCormick, I think at this point, I think we've heard what you've had to say, and we're all familiar with your briefs and the arguments that were made in the briefs. And I think at this point, I'm going to ask Judge Keenan and Judge Diaz if they have any further questions for you. Judge Keenan, do you have any further questions? No, thank you. Judge Diaz, do you have any further questions? I do not. Thank you. All right. Thank you, Mr. McCormick. You've reserved some time for rebuttal, okay? Yes. Thank you, Your Honor. All right. Let's hear from the appellee now. May it please the Court. Good afternoon, Your Honors. Sort of addressing something that Mr. McCormick just discussed in the whole process of a disability retirement application, so that the record is clear. What occurs when an employee files for disability retirement, they submit an application to the HR director. And then the HR director, per the city code at the time, which has now been incorporated in a retirement plan, but the provisions are still the same, the HR director selects a physician, and based on the IME that's conducted by that physician, they look at all of the evidence. But the selection of that physician in the IME is going to be the lead basis for making a determination. So it is per the city code that Mr. Rennstedt, at the time that the appellant had submitted his disability request, excuse me, his disability retirement application, that Mr. Rennstedt did exactly what the city code required him to do. With regard to the comparators, I just sort of want to touch on that briefly because it's the city's position that the denial of disability retirement is not an adverse employment action. And we still maintain that the appellant hasn't been able to present any sort of substantial argument or legal authority to indicate that denial of a disability retirement application is an adverse employment action. There's no allegation of a decrease in compensation or, you know, job title, level of responsibility, or some sort of significant change in his employment status. But the letter that was issued, it's correct that one of your honors indicated, and I'm glad that you pointed it out, is that that letter was written by an administrative employee of human resources when her disability retirement application was granted. An IME was conducted, and Mr. Rennstedt did testify that he relied on the IME that was conducted that stated that she could not- Ms. Berger, can I ask about that? So in response to that question, which I was the one who asked it, your opponent on the other side said, well, judge, we're at summary judgment. What that means is we've got a disputed issue of fact, a letter that suggests that Mr. Rennstedt relied solely upon the advice of the treating physician and then his testimony that suggests otherwise. So why, how do we resolve that conflict? Well, because the letter wasn't written by Mr. Rennstedt, and it was written by someone who was not- Well, he signed it though, didn't he? I would have to double check that. I can't say off the top of my head one way or the other. But I also, I do want to point out that at the time that Mr. Rennstedt was the HR director, there were three employees that submitted an application for disability retirement. Ms. Keyes, the appellant, and then there was a third individual who was an African-American male who had an injury who submitted to an IME as well. And that IME said that he could not return to work as a police officer. And Mr. Rennstedt granted that disability retirement application. So the only difference between the disability retirement application submitted by the appellant and the two other individuals is that the two other individuals had IMEs that said that those individuals could not perform the physical tasks associated with being a police officer. And Mr., the appellant, had an IME that had two IMEs at that point that said that he could return to full duty as a police officer. And that was the basis of the denial of the disability retirement application. Mr. Rennstedt- Ms. Berger, can I, I'm sorry, can I follow up with your earlier comments about what constitutes an adverse employment action and what doesn't? You know, I'm inclined to agree with you that I'm not sure that a denial of disability retirement is an adverse employment action. I mean, the city had an obligation to act one way or the other. And as you pointed out, it doesn't strike me that there's any reduction in compensation or other activity. He's asking for a benefit, and he's being denied that benefit. But I don't see how that amounts to an adverse employment action. But even if that's true, I mean, you're not disputing that there are other adverse employment actions that satisfy that element, are you? No, I'm not. So the city acknowledges that the placement on leave without pay and the termination are considered adverse employment actions. Any other allegations- So why does it matter, why does it matter whether the denial of disability retirement is an adverse employment action? Because that- In this case. In this case. Correct, yes. So that's the sort of what the appellant is hanging his hat on in terms of comparators specifically. He focuses, I mean, his entire argument was pretty much on the disability retirement denial. And the talk of comparators and all of that are all related to the disability retirement denial. He has failed to address in any meaningful way the leave without pay aspect and has sort of touched upon the termination, which I'll get into. But the vast majority of his arguments have been related to the disability retirement process to include sort of re-litigating the merits of it, which I will point out that, yes, it was appealed. Mr. Ernst's decision was appealed to the Public Safety Disability Retirement Board. Then when they issued their opinion saying that the appellant was capable of physically performing the job functions of a police officer, he appealed to the circuit court for Anne Arundel County. The judge there affirms the decision of the board. And then it was appealed to the Court of Special Appeals where it was dismissed because the appellant never filed a brief. So he did go through his sort of due process rights as it relates to the merits of the disability retirement denial. Ms. Berger, this is Judge Keenan. With regard to the two adverse employment actions we have here, the leave without pay and the termination, from your perspective, those are the only two. Was there any comparative evidence regarding employee conduct or regarding other comparative criteria with regard to the termination of his employment or the placement on leave without pay? I guess I'm struggling here to see where the comparative evidence is other than keys as it relates to disability retirement. So could you tell me what the record shows from your perspective regarding comparative evidence with regard to leave without pay and termination and employee misconduct? In other words, that there were people treated differently than Officer Thomas was treated. There is no evidence. And that's sort of why I said that the main argument that Mr. McCormick is relying on is comparative evidence as it relates to medical issues. The city was never faced with a scenario where someone had been cleared to return to work on multiple occasions, did not want to, to the point of actually admitting he did not want to return as a police officer, but also failing to remain in contact with his supervisors. There's never been in any other scenario where that has come up. And he had a good seven month period to correct that deficiency, which was, you know, the unsatisfactory job performance of keeping in contact with his supervisors as he was told numerous times to do. There's no other, there's no evidence of any, anything similar occurring with other officers or other employees within the city of Annapolis. This was a case of first impression as I had indicated in one of the briefs. So the only, I guess, topic that comparative evidence could be brought into the cases with that disability retirement process, which we have maintained is not an adverse employment action. Okay, thank you. You're welcome. So I sort of want to touch on the satisfactory job performance element with the termination and leave without pay parts. I do want to sort of emphasize again that the appellant hasn't really addressed the leave without pay adverse employment action and hasn't really provided many arguments in support thereof. It's been mostly on the termination. But at the time he was placed on leave without pay and the dates were somewhat inaccurate. I do want to clarify that the appellant was placed on either light duty or medical status from March 2014 to June 2015. And then he was again placed on a light duty status from June 2015, about five hours after he had come back to full duty and three hours after he began his patrol duty. He then was placed on light duty again until July 21st, 2015. And then, or I'm sorry, I think it was July 20th, 2015. July 21st of 2015, he went on FMLA until I believe it was October 12th of 2015. And then from August 4th, 2015 through November 8th, 2015, he was on short-term disability. So he was on a form of light duty or medical status for well over a year. He was also on FMLA and short-term disability. So he didn't go on leave without pay until November 9th, 2015, which was 16, 18 months after the injury of March 2014. Now, what Mr. Renstad testified to was if there is a employee who's going to be out of work for medical reasons, the employee and their supervisors will come up with the best way to communicate regarding updates to their medical status. And as everyone is well aware, there were several phone calls that were made, voicemails that were left, emails that were sent, and the in-person communications from the appellant's supervisors that he's still an employee of the city. He is to remain in contact with his supervisors. And there's nothing evidentiary-wise to indicate that the appellant wanted communication to go through his attorneys. That sort of came up for the first time in briefing in this argument. There's no affidavit. There's nothing that indicates that there was a request to communicate through attorneys. And there was this expectation that any updates or just a phone call back saying, hey, no medical updates, I don't have anything to provide. That was an expectation, and it was a legitimate expectation of the city, and the fact that he refused to return those calls, refused to communicate with his employees, especially after the Public Safety Disability Retirement Board rendered their decision. There were still phone calls that went unanswered. He hung up on one of his supervisors, and he did not return any phone calls or reach out to the police department in any way to communicate at all, much less about a return to work. That was not a satisfactory job performance that he could not have. That does not rise to the level of his legitimate expectations. Ms. Berger, could I ask about that? Initially, I was concerned about the fact that an employer in this case could use this sort of requirement of phone calls and messages and the like for someone who's out on leave as sort of a way, as a trap for the unwary employee who doesn't miss an occasional call or an email and then say you haven't been performing satisfactorily. I have two questions. One, you described this process, and it sounds like this is not something that was unique to Officer Thomas. It's something that would have been required of anyone, any officer who was on leave without pay. That is the requirement to communicate regularly with his employer. Is that right? That's correct, yes. So if there had been maybe an occasional missed call or an email, I imagine that would be an entirely different matter. Your point is that this reached out in response to these calls and or emails. And as you, I think, pointed out, I guess we'll ask Mr. McCormick about this, never once indicated that he wished to communicate through his lawyer with respect to these, you know, with respect to his employer. Is that right? That's right. Counselor, you're contending that the only two adverse for the termination and the placement on unpaid leave and that the termination was the result of multiple phone calls that weren't returned. And as I understand it, there was some in-person contacts that never, in-person reminders that didn't result in any constructive information and that this all took place over a seven-month period that these attempts to get in touch with him. It wasn't just a two-week time. It was over seven months. And then, as I understand it, the second adverse employment was the decision to place him on unpaid leave. And from what I gather is I want to make sure I understand your argument here that the unpaid leave was simply an administrative call and occurred only after there was an extended period of leave and light duty provided him. So to just clarify, I'm inclined to, in fact, I do agree with Judge Diaz that it's not clear that a denial of a disability benefit on which an employer is compelled to make a decision, that that would be an adverse employment action. But as I understand it, you're claiming two, the termination, which occurred only after this prolonged period of noncommunication, and then the placement on unpaid leave, which I understand the chief made only after there was an extended period of leave and light duty provided the plaintiff. Is that correct? Yes, that's correct. The city code allows for the placement of an employee on authorized leave without pay if they use all of their accrued leave and maintains that they still cannot report for work. But he had been on paid leave before that, right? Yes, correct. And it was only after he'd exhausted his accrued leave that he went on unpaid leave. Yes, that's correct. And how long was the paid leave? So he was on paid leave, well, it sort of was, I guess, bifurcated because when he first got injured, it was in March 9th of 2014. So then he was placed in between sort of on a medical status or medical leave or light duty. He had his surgery in June of 2014, returned in August 12th of 2014 to light duty. And then he was given light duty after, well, he actually maintained on light duty until Dr. Friedler's IME said that he could return to full duty. Then he came back to work, like I said, for five hours and then went back out on light duty again and I think maybe a couple of days of medical leave. But he was informed at the time that he went back out on light duty in June of 2015 that he could use all of his available leave that he had. But if he didn't or once he hit that point where he wasn't, he'd had no more leave left, then he would probably most likely end up on leave without pay status. So I don't know going into his initial injury in March 29th, 2014, how much leave he had accrued at that point. But I will say he had gotten injured about a year after he had been hired. So he probably did not have that much sick leave at all. Yeah, I go back to one of my colleagues, I guess both of them, the questions because they put their finger on what concerns me. And that is what does all this have to do with discrimination? And the reason that a lot of the department's efforts seem perfectly reasonable and even accommodative. And then, you know, I asked myself, well, the reason I don't think it has much of anything to do with discrimination is there's no comparator. And, I mean, I think that's a long, you know, seven months is a long time to go without letting your employer know what's up. It just bothers me. But I'm going to ask Judge Keenan, do you have some further questions of counsel? No, thank you. Judge Diaz, would you like to ask counsel some further questions? No, thank you, Judge Wilkinson. Thank you very much, counsel. We appreciate your argument. You're welcome. Thank you, Your Honors. Uh-huh. Mr. McCormick, you've got some light of what you've just heard. You have some time for rebuttal. So why don't you step forward and give us your rebuttal? Thank you, Your Honor. Your Honor, first off, can you hear me? Yes. Okay, thank you. First off, let's talk about the dates. First, Mr. Thomas, after he was injured, he went out on duty. I mean, he went out on light duty in March immediately after the injury. He had surgery in June, so he was not on light duty from June through August. Mr. Thomas was on continuous light duty from August until June when he was ordered to return back to full duty. Now, the order to return back to full duty was based purely on the IME from Dr. Friedler. So, again, you know, at a minimum, Mr. Thomas had requested accommodations, requested light duty accommodations, and was denied that accommodation when he was forced to return back to light duty in June of 2015. So at a minimum, that was a denial of a request for accommodation. In addition to that denial, I know that, Your Honor, the panel is concerned about the seven-month period where the city has indicated that Mr. Thomas hasn't contacted his employer, but that's simply not true. Well, let me rephrase that. Mr. Thomas contacted the employer and provided the information that they were requesting. So the employer was requesting updated information on Mr. Thomas's medical status. He provided that through his attorney and through his doctor. But with respect to contacting his employer, actually speaking to his employer, no, he did not do that. However, he did comply with what they requested. Also, it is important to note, I think, that Mr. Thomas was a police officer, and police officers respond or not to orders. And Mr. Thomas, even though he was still injured in June of 2015, he still responded to the order to return back to full duty, even though he had to hobble while he had to recertify for his gun permit, and he was still injured when he went on duty the first day. He still did comply with the order as long as he could until he got injured again. Okay, Mr. Thomas, excuse me, Mr. McCormick, this is Judge Keenan again. Is there evidence in the record during this period where he wasn't responding directly to the police department? Is there any evidence that he sent them back a message saying, due to my complicated employment situation, I request that all communication be made through my attorney? Did he do that during the seven-month period? And if so, could you show us where in the record that is? Yes, Your Honor, that would be in Mr. Thomas's deposition transcript. And I believe that's in the record. I can't point to it right now, but I know that Mr. Thomas mentioned it in his deposition transcript, and I believe that I cited to it in either the brief, the reply brief, and or the motion for summary judgment. But Mr. Thomas did ask for, Mr. Thomas, through his attorney, did ask that the communications go through the attorney. And he was still contacted by the department. So the department was. So you're saying that he made personal contact and said, due to advice from my counsel, I'm referring all matters concerning my employment status to my lawyer. My my my understanding and recollection, Your Honor, is that Mr. That that these that it was more than one discussion and that the discussions occurred either shortly before or shortly after the hearing on the disability retirement. So it would have been Mr. I think that Mr. Thomas was there with his attorney and they were communicating this to the employer. Because I did look, I did look for that in the record and I wasn't able to find it. But that doesn't mean, you know, that it's not there. So I can provide additional briefing. I know it's there somewhere. I just cannot. I just cannot point to it right now. OK. Thank you. Yep. Your Honor. Also, I know that the court is concerned about whether or not there was a comparator for the termination for the leave without pay. And and the reason why we didn't provide a comparator is because if you're if you're injured, you get a disability retirement. And if you have a disability retirement, then there's no need to terminate you. So there wouldn't have been a comparator because no one else was terminated while they were still injured. And I know that is the city's contention that Mr. Thomas wasn't injured. And that's why they were able to return him back to full duty. But but Mr. Thomas. His his. According to his physician, according even to the city's physician on the third IME. Yes, he was still injured where he couldn't return back to duty. And even Dr. Even Dr. Friedler stated that he would not have that that Mr. Thomas would not have been able to that Mr. Thomas would not have been able to perform, able to be hired to the position of police officers. And I think really. And I think it's also important that I know that Dr. Maine's IME was mentioned. Dr. Maine gave Ms. Keys an 11 percent disability rating and said that she could not return back to duty. Mr. Thomas, according to Mr. Dr. Friedler, had a 22 percent disability rating and was still returned back to duty. So the varying decisions for the IME on I for IME doctors based on what they what they perceive at the time, there is apparently a very substantially. And again, even though the court hasn't had an opportunity to review this issue of treating physician, the treating physician doctrine, I think that in this case it might be might be applicable. We're in the we're in your brief. Is there a discussion of communicating through that? You wanted communications directed through the attorney. You know, I read the I read the briefs and I didn't. You know, that would seem to me that if the argument was there, that that might have been emphasized and I didn't see that. Your Honor, I'm I'm I'm fairly certain that that I briefly pointed it out because I remember it. And I'm fairly certain that it's in Mr. Thomas's deposition transcript. I can't find it right now, but I am more talking about in the brief. Yes, Your Honor. I can't find it in the brief right now, but I am more than willing to provide the thing. That would be the kind of thing that would be mentioned in a brief. Right. I'm I'm I'm sure that I'm sure that that it's either in this that it's either in the brief in the reply brief or in the motion for summary. The opposition to the motion for summary judgment. But I'm not sure which document or if it's in all three right now. But, Your Honor, I can certainly provide a very short, you know, one one to two page additional brief, just pointing the court to where just pointing the court to to that those references more than happy to do so. Judge Keenan, do you have any further questions? No, thanks. Judge Diaz. I do not. Thank you. All right. We thank you, Mr. McCormick. And as I say, I'm sorry that we can't come down and greet counsel. But we thank you for your argument. And I. I'll ask the courtroom deputy, please, to adjourn court. Thank you. Thank you, Your Honors. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, Albert Diaz